No. 15-13864

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

*for the*

# 𝔈𝔩𝔢𝔳𝔢𝔫𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

———————◆———————

TELESTRATA, LLC, a Colorado limited liability company, individually
and derivatively on behalf of the shareholders of NetTALK.com, Inc.,
a Florida corporation,

*Plaintiff-Appellee,*

– v. –

NETTALK.COM, INC., 1080 NW 163rd Drive Suite B-4 North Miami,
FL 33169, a Florida corporation, STEVEN HEALY, ANASTASIOS "NICK"
KYRIAKIDES, II, KENNETH HOSFELD, GARRY PAXINOS, KYRIAKIDES
INVESTMENTS, LTD., a Florida limited partnership, SHADRON STASTNEY,
ANGELA ILISIE, ANASTASIOS KYRIAKIDES, a.k.a. Takis,

*Defendants-Counter Claimants-Appellants,*

– and –

SAMEER BISHAY, *et al.*,

*Counter Defendants.*

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA IN CASE NO. 14-CV-24137
(HONORABLE JAMES LAWRENCE KING)

## BRIEF FOR DEFENDANTS-COUNTER
## CLAIMANTS-APPELLANTS

CHRISTOPHER PHILIP MILAZZO
CASS SANFORD
SICHENZIA ROSS FRIEDMAN
    FERENCE, LLP
*Attorneys for Defendants-Counter
    Claimants-Appellants*
61 Broadway 32nd Floor
New York, New York 10006
(212) 981-6775

*Telestrata, LLC v. NetTalk, Inc.*
Case No. 15-13864-A

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1,

Defendants/Appellants NetTalk.com, Inc. ("NetTalk"), Anasatosios "Takis"

Kyriakides, Steven Healy, Anasatosios "Nick" Kyriakides II, Kenneth Hosfeld,

Garry Paxinos, Kyriakides Investments, Ltd. ("KI"), Shadron Stastney and Angela

Ilisie (collectively, "Appellants" or "Defendants"), by and through their

undersigned counsel, hereby certify that there are no corporate parents of

Appellants NetTalk and KI, that no publicly held corporation owns 10% or more of

Appellants NetTalk and KI's stock, and that the following persons and entities

have or may have an interest in the outcome of this case:

> 1080 NW 163 Drive, LLC
>
> Aljasrawi, Nadir
>
> Aparicio, Oscar
>
> Bishara, Maged
>
> Bishay, Samer
>
> Canadadirect Database Marketing Inc.
>
> Cartaya, Javier
>
> Cragg Martin, Matthew
>
> Damian & Valori LLP

*Telestrata, LLC v. NetTalk, Inc.*
Case No. 15-13864-A

Davis, Maria

Delgado, Daniel

Diaz, Ramon

Escudero Leon, William

Fernandez, Amanda

Gabb, George

Gaebe Mullen Antonelli & Dimatteo

Gonzalez, Alain

Harari, Alain

Healy, Steven

Hernandez, Carlos

Hosfeld, Kenneth

Ilisie, Angela

Iris Technologies Inc.

JMJ Financial

KBM Worldwide, Inc.

Keithley, R. Livingston

Kelly & Walker LLC

King, Khambrel

Kyriakides, Anastasios ("Takis")

Kyriakides, Anastasios II ("Nick")

Kyriakides Investments, Ltd.

Kyriakides, Peter

Kyriakides, Stephanie

Manzewitsch, Leo

Martin, Matthew

Matews, Marcelo

Mau, Wing Man

Milazzo, Christopher

NetTalk.com, Inc. ("NTLK")

Ortiz, Charles

Paxinos, Garry

Phoenix Vitae Holdings, LLC

Ramirez, Diana

Rhau, Romualde Valentia

Sanford, Cass

Sichenzia Ross Friedman Ference LLP

Stastney, Shadron

Telestrata, LLC

Valori, Peter

## STATEMENT REGARDING ORAL ARGUMENT

Defendants/Appellants, pursuant to Rule 34(a) of the Federal Rules of Appellate Procedure, and Eleventh Circuit Rules 28-1 and 34-3, respectfully request oral argument of this appeal.  This case presents issues of great importance to Defendant NetTalk.com, a publicly traded company, as the preliminary injunction that was granted has greatly limited its ability to, *inter alia*, operate in the normal course, raise funds to continue its operations and comply with certain obligations under promissory notes.  Appellants believe that oral argument will assist this Court in its determination of the issues presented on this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT.................................................................. c-i

STATEMENT REGARDING ORAL ARGUMENT ............................................iv

TABLE OF AUTHORITIES ................................................................ viii

JURISDICTIONAL STATEMENT ...................................................................1

ISSUES PRESENTED FOR REVIEW ...................................................................1

STATEMENT OF THE CASE...................................................................2

    A.    Parties ...................................................................3

    B.    Background ...................................................................4

    C.    Bishara Makes Loans to NetTalk ...................................................................4

    D.    The Parties Begin to Negotiate for a Potential Investment in
        NetTalk ...................................................................4

    E.    The Individual Defendants Are Issued Stock Under the 2012
        NetTalk Employee Stock Option Plan ...................................................6

    F.    Bishay and Bishara Force a Deal ...................................................................6

    G.    Telestrata Performs Due Diligence ...................................................................7

    H.    The Parties Execute a Restricted Stock and Warrant Purchase
        Agreement ...................................................................9

    I.    KBM and JMJ Invest in NetTalk ...................................................................10

    J.    Telestrata Attempts to Take Control of NetTalk...................................................11

    K.    May 2015 Corporate Actions ...................................................................12

PROCEDURAL HISTORY...................................................................13

    A.    Plaintiff Commenced this Action...................................................................13

    B.    Defendants Answer and Assert Counterclaims...................................................13

    C.    Plaintiff Moves for a Temporary Restraining Order and a
        Preliminary Injunction...................................................................14

D.     The Order ...................................................................15

SUMMARY OF THE ARGUMENT ...................................................19

STANDARD OF REVIEW ................................................................22

ARGUMENT AND CITATIONS OF AUTHORITY ...........................................23

I.     THE DISTRICT COURT ERRED IN GRANTING
PLAINTIFF'S MOTION FOR A PRELIMINARY
INJUNCTION ...................................................................23

     A.     Plaintiff Did Not Establish a Likelihood of Success on
its Fourth and Eight Causes of Action ......................................24

         1.     The District Court Erroneously Determined That
Telestrata Met its Burden of Establishing it is
Likely to Succeed on its Fourth Cause of Action ..........25

         2.     Plaintiff Failed to Establish That it is Likely to
Succeed on its Fraud Claim .............................................30

             a.     Any Alleged Reliance on a
Misrepresentation Concerning the
Percentage of Ownership of NetTalk that
Plaintiff Would Receive Under the SPA
was Unreasonable as a Matter of Law ................31

             b.     Plaintiff Could Not Have Relied Upon
Any Alleged Representation Concerning
Defendants' Percentage of Ownership in
NetTalk ...............................................................37

     B.     The District Court Erred in Finding that Plaintiff
Established that it Would Suffer Irreparable Harm
Absent a Preliminary Injunction ...............................................40

         1.     Plaintiff's Unexplained Eight Month Delay in
Seeking Injunctive Relief Precludes a Finding of
Irreparable Harm...............................................................41

         2.     The District Court Erred in Determining that the
Past Alleged Dilution and Potential Future
Dilution of Plaintiff's Ownership Interest in
NetTalk Constitutes Irreparable Harm ..........................44

vi

3.    Any Claimed Harm From Dilution is Speculative .........47

4.    Any Alleged Damage Can be Adequately
      Compensated by Money Damages ..................................48

C.    The District Court Incorrectly Determined That a
      Balancing of the Harms Favored Plaintiff ................................49

1.    NetTalk Relies on Issuing Stock to Survive..................51

2.    The TRO and Preliminary Injunction Cause
      NetTalk to Default on Convertible Notes.......................52

3.    NetTalk will be Forced Out of Business and Into
      Bankruptcy....................................................................54

II.    THE DISTRICT COURT ERRED IN SETTING THE BOND
       AMOUNT AT $10,000 .......................................................................55

CONCLUSION .........................................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Addison v. Carballosa*,
    48 So.3d 951 (Fla. DCA 3d Dist. 2010)....................................................32, 37

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*,
    297 F.R.D. 633 (N.D. Ala.2014) ....................................................56

*Bloedorn v. Grube*,
    631 F.3d 1218 (11th Cir. 2011) ....................................................24

*Burger v. Hartley*,
    2011 WL 6826645 (S.D. Fla., Dec. 28, 2011)..............................................42

*Butler v. Alabama Jud'l Ing. Comm'n*,
    111 F. Supp. 2d 1224 (M.D. Ala. 2000)..........................................25

*Canal Authority v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ....................................................24

*CBS Broadcasting, Inc. v. EchoStar Commc'ns Corp.*,
    265 F.3d 1193 (11th Cir.2011) ............................................23, 25

*Creative Am. Ed., LLC v. The Learning Experience Sys., LLC*,
    2015 WL 2218847 (S.D. Fla., May 11, 2015)........................................31, 32

*CWIE, LLC v. Bandwith Consulting, Inc.*,
    2009 WL 1110479 (C.D. Cal., Apr. 20, 2009)..............................................44

*E. Remy Martin & Co. v. Shaw-Ross Int'l Imports*,
    756 F.2d 1525 (11th Cir. 1985) ....................................................22

*Elbow River Mktg. L.P. v. Clean Fuel Lakeland, LLC*,
    2010 WL 5209345 (M.D. Fla., Dec. 16, 2010) ............................................33

*Ferrero v. Associated Materials, Inc.*,
    923 F.2d 1441 (11th Cir. 1991) ............................................40, 48

*FHR TB, LLC v. TB Isle Resort, LP*,
    865 F. Supp. 2d 1172 (S.D. Fla 2011)..........................................40

*Forsyth County v. U.S. Army Corps of Engineers*,
    633 F.3d 1032 (11th Cir. 2011) ....................................................22

*Four Seasons Hotel & Resorts, BV v. Consorcio Barr, SA*,
    320 F.3d 1205 (11th Cir. 2003) ....................................................................23

*G Barrett LLC v. The Ginn Co.*,
    2011 WL 6752551 (M.D. Fla., Dec. 13, 2011) ........................................31, 32

*Gitlitz v. Bellock*,
    171 P.3d 1274 (Colo. App. 2007).................................................................46

*Goshen Road Environmental Action Team v. USDA*,
    103 F.3d 117, 1996 WL 719963 (4th Cir.1996)............................................52

*GPS Industries, LLC v. Lewis*,
    691 F.Supp.2d 1327 (M.D. Fla. 2010) ........................................................49

*Grupo Televisa, S.A. v. Telemundo Commun. Grp. Inc.*,
    486 F.3d 1233 (11th Cir. 2007) ...................................................................24

*Hillcrest Pac. Corp. v. Yamamura*,
    727 So.2d 1053 (Fla. DCA 4th 1999)..............................................31, 32, 33

*Ioannides v. Romagusa*,
    93 So.3d 431 (Fla. DCA 4th Dist. 2012)..........................................32, 33, 36

*Klein v. Panic*,
    1986 WL 438 (Del. Ch., Nov. 20, 1986) .....................................................45

*L&L Doc's, LLC v. Florida Div. of Alcholic Bev. & Tobacco*,
    882 So.2d 512 (Fla. DCA, 4th Dist. 2004)..................................................37

*Louisiana Mun. Police Emp. Ret. Sys.*,
    886 F. Supp.2d 1255 (W.D. Okla. 2012)................................................45, 46

*M/I Schottenstein Homes, Inc. v. Azam*,
    813 So.2d 91 (Fla. 2002) .......................................................................32, 38

*Mac-Gray Servs., Inc. v. DeGeorge*,
    913 So.2d 630 (Fla. DCA 4th Dist. 2005)..............................................33, 36

*Machlett Labs., Inc. v. Techny Indus., Inc.*,
    665 F.2d 795 (7th Cir.1981) ........................................................................55

*McDonald's Corp. v. Robertson*,
    147 F.3d 1301 (11th Cir. 1998) ...................................................................22

*Mead Johnson & Co. v. Abbott Lab.*,
    201 F.3d 883 (7th Cir. 2000) .......................................................................56

*Miller's Ale House v. Boynton Carolina Ale House*,
　　2009 WL 6812111 (S.D. Fla., Oct. 13, 2009), *recommendation and
　　report adopted by,* 2009 WL 6812112 (S.D. Fla., Nov. 30, 2009) ..............54

*Mobile County Water, Sewer & Fire Prot. Auth. v.
　　Mobile Area Water & Sewer Sys., Inc.,*
　　2007 WL 3208587 (S.D. Ala., Oct. 29, 2007)...............................................42

*Norman v. Padgett*,
　　125 So.3d 977 (Fla. DCA 3d Dist. 2013) .....................................................32

*Outcomes Pharm. Health Care, L.C. v. Nat'l Cmty. Pharmacists Ass'n*,
　　2006 U.S. Dist. LEXIS 92927 (S.D. Iowa Dec. 22, 2006).........................54

*Rosen v. Cascade Int'l, Inc.,*
　　21 F.3d 1520 (11th Cir. 1994) ......................................................................22

*Sampson v. Murray,*
　　415 U.S. 61 (1974)........................................................................................40

*Schaffer v. Globe Protection, Inc.,*
　　721 F.2d 1121 (7th Cir. 1983) ......................................................................43

*Schiavo ex rel. Schindler v. Schiavo,*
　　403 F.3d 1223 (11th Cir. 2005) ....................................................................22

*Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*,
　　697 F.2d 1352 (11th Cir. 1983) ....................................................................23

*Siegel v. LePore*,
　　234 F.3d 1163 (11th Cir. 2000) ..............................................................40, 49

*Southern Wine & Spirits of Am., Inc. v. Simpkins*,
　　2011 WL 124631 (S.D. Fla., Jan. 14, 2011)................................................25

*Statewide Detective Agency v. Miller*,
　　115 F.3d 904 (11th Cir. 1997) ......................................................................22

*Street v. Viti*,
　　685 F. Supp. 379 (S.D.N.Y. 1988) ..............................................................46

*Structural Tenting Corp. v. The Termite Doctor*,
　　2010 WL 1650910 (S.D. Fla., Jun. 30, 2010) ..............................................42

*Taylor v. Biglari*,
　　971 F. Supp.2d 847 (S.D. Ind. 2013)............................................................42

*Tobnick v. Novella*,
  2015 WL 1526196 (S.D. Fla., Apr. 2, 2015)...................................................41

*Tough Traveler, Ltd. v. Outbound Prods.*,
  60 F.3d 964 (2d Cir. 1995) ............................................................................42

*U.S. Bank Nat'l Ass'n v. Turquoise Props. Gulf, Inc.*,
  2010 WL 2594866 (S.D. Ala., Jun. 18, 2010)..........................................41, 42

*United States v. Jenkins*,
  714 F. Supp.2d 1213 (S.D. Ga. 2008) ...........................................................47

*Warsteiner Imp. Agency, Inc. v. Republic Nat'l Distrib. Co., LLC*,
  2008 WL 4104568 (M.D. Fla., Jul. 31, 2008)................................................23

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008)............................................................................................47

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*,
  339 F.3d 101 (2d Cir. 2003) ...........................................................................46

*Woods v. On Baldwin Pond, LLC*,
  2014 WL 4791990 (M.D. Fla., Sep. 19, 2014)...............................................38

## Statutes & Other Authorities:

28 U.S.C. § 1292(a) ................................................................................................1

28 U.S.C. § 1332......................................................................................................1

28 U.S.C. § 1367......................................................................................................1

Fed. R. App. P. 4(a)(1)(A) ......................................................................................1

Fed. R. Civ. P. 65 ..................................................................................................24

Fed. R. Civ. P. 65(c)........................................................................................55, 56

Fla. Stat. § 607.0704 .............................................................................................12

Fla. Stat. § 607.0808 .............................................................................................12

xi

## JURISDICTIONAL STATEMENT

The District Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  This action is between citizens of different states and the amount in controversy exceeds $75,000.  (Doc. 1 – Pgs 3-4.)  Defendant NetTalk.com, Inc. ("NetTalk") has asserted counterclaims against Plaintiff Telestrata, LLC ("Telestrata" or "Plaintiff") and Additional Counterclaim Defendants Samer Bishay ("Bishay"), Maged Bishara ("Bishara") and Nadir Aljasrawi ("Aljasrawi") (collectively, "Counterclaim Defendants") – citizens of Canada – in which NetTalk seeks more than $3,000,000 in damages.  (Doc. 27.) The District Court has supplemental jurisdiction over the counterclaims.  28 U.S.C. § 1367.

This Court has jurisdiction over the instant appeal of the Order dated August 19, 2015 (the "Order"), which granted Plaintiff's motion for a preliminary injunction pursuant to 28 U.S.C. § 1292(a).   (Doc. 69.)  The Order was filed on August 19, 2015.  (*Id*.)  Defendants timely filed their Notice of Appeal on August 26, 2015.  (Doc 73.)  *See* Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED FOR REVIEW

1. Did the District Court incorrectly apply the burden of proof required for the issuance of a preliminary injunction?

2. Did the District Court err in determining that Plaintiff established a likelihood of success on the merits of its Fourth and Eighth Causes of Action?

3. Did the District Court err in determining that Plaintiff would suffer irreparable harm where the only harm alleged was the dilution of Plaintiff's ownership interest in NetTalk and its inability to control NetTalk?

4. Did Plaintiff's eight month delay in seeking preliminary injunctive relief preclude a finding of irreparable harm?

5. Did the District Court err in finding irreparable harm where Plaintiff could be fully compensated by money damages?

6. Did the District Court err in finding that Plaintiff established that a balance of the harms weighed in favor of Plaintiff?

7. Whether the District Court abused its discretion in setting the security required by Rule 65(c) at $10,000?

## **STATEMENT OF THE CASE**

This action involves a dispute between two factions of shareholders of NetTalk – Telestrata and the Individual Defendants – as to which faction should have control over NetTalk. Plaintiff asserts that, pursuant to a Restricted Stock Purchase and Warrant Agreement dated March 11, 2014 (the "SPA"), it should

have had a majority ownership interest in NetTalk.  Plaintiff's contention is meritless.

### A.    <u>Parties</u>

NetTalk is an early-stage, publicly-traded telecommunications company which provides Voice Over Internet Protocol ("VoIP") services to commercial and residential customers.  (Doc 64 – Pg 102.)  NetTalk also designs and sells a number of products, including adapters that allow analog telephones to connect to the Internet and make low-cost VoIP calls.   (Doc. 27 – Pg 18.)  Defendants Anasatosios "Takis" Kyriakides ("T. Kyriakides"), Steven Healy ("Healy"), Anasatosios "Nick" Kyriakides II ("N. Kyriakides"), Kenneth Hosfeld ("Hosfeld"), Garry Paxinos ("Paxinos"), Kyriakides Investments, Ltd., Shadron Stastney and Angela Ilisie (collectively, the "Individual Defendants") are shareholders, officers and/or directors of NetTalk. (Doc 27 – Pgs 2-3.)[1]

Telestrata is a holding company owned and/or controlled by Bishay, Bishara and Aljaswari, and which was formed for the purpose of investing in NetTalk. (Doc 63 – Pg 46.)  Bishay and Bishara are also owners and/or officers of non-party Iristel, Inc. ("Iristel"), a Canadian corporation which provides VoIP services to residential, commercial and other telecommunication providers.  (*Id.* at 8.)

---

[1] NetTalk and the Individual Defendants may also be referred to collectively herein as the "Defendants".

### B.    <u>Background</u>

Beginning in or about 2011, Iristel began providing services to NetTalk to facilitate NetTalk's expansion into the Canadian market.  (*Id.* at 9.)  Iristel was providing services, for a fee, to NetTalk that were crucial to NetTalk's business.  (Doc  64 – Pg 117.)  Among other things, Iristel's service allowed NetTalk to connect analog telephones to the VoIP network. (*Id.* at 118.)

### C.    <u>Bishara Makes Loans to NetTalk</u>

Bishay first met certain Individual Defendants in or around the end of 2012 and shortly thereafter began discussing the possibility of making an investment in NetTalk.  (Doc 63 – Pg 17.)  In May and July 2013, Bishay, individually, invested $500,000 in NetTalk in two transactions.  (Doc 27 – Pgs 19-20.)  In these transactions, Bishay received two convertible promissory notes with a total face value of $500,000.  (*Id.* at 19.)  Bishay's $500,000 investment was secured with a second mortgage on real property owned by NetTalk in the Miami-Dade County, Florida (the "NetTalk Property").  (Doc 42-1 – Pg 3.)

### D.    The Parties Begin to Negotiate for<br>a Potential Investment in NetTalk

In 2013, the parties engaged in preliminary negotiations concerning a potential equity investment in NetTalk by Iristel or another entity controlled by Bishay.  (Doc 62 – P. Exh. 1)  In late June, 2013, NetTalk and Bishay executed a letter of intent, dated June 27, 2013 (the "LOI") regarding a potential investment in

NetTalk. (*Id.*) Specifically, the LOI provided for an automatic termination date of July 15, 2013 if no definitive agreement was reached, and provided as follows:

> This letter, including the first paragraph hereof, is intended to express only a mutual indication of interest in the Transaction and does not represent any form of legally binding commitment or obligation […] The parties hereby stipulate that (i) the terms set forth in this letter do not contain all material terms to be negotiated in the Definitive Agreements, (ii) no course of conduct or dealings between the parties may be introduced as evidence that there exists a binding contract or commitment between the parties with respect to the Transaction, other than as set forth in the Binding Provisions and (iii) no party shall be justified in relying on any provision of this letter, other than the Binding Provisions, in connection with the Transaction. [2]

(*Id.* at 8.)

Upon the termination date provided for in the LOI, the parties had yet to execute a definitive agreement. (Doc 63 – Pg 78.) Notwithstanding, during the time between the termination of the LOI and the execution of the SPA, Iristel and NetTalk continued to do business together and the parties continued to negotiate for an agreement for a long-term investment in NetTalk. (Doc 64 – Pgs 118-119.)

---

[2] The "Binding Provisions" include only obligations regarding, *inter alia*, indemnification, due diligence and confidentiality. (Doc 62, P Exh 1 – Pg 8.)

**E.      The Individual Defendants Are Issued Stock Under
the 2012 NetTalk Employee Stock Option Plan**

On December 18, 2013, NetTalk's Board of Directors, by written action,

authorized the issuance and distribution of approximately 10 million shares of

common stock pursuant to NetTalk's 2012 employee stock option plan ("2012

ESOP").[3] (Doc 62 – D Exh 7.)  Attached to the Board's written action was a chart

that set forth the persons to whom the shares were to be awarded and how the

shares were to be allocated. (*Id*.)

On or about March 3, 2014, before the execution of the SPA, instructions

were sent to NetTalk's transfer agent to issue the shares of stock to the persons that

had been awarded pursuant to the 2012 ESOP.  (*Id*. at D. Exh. 12).  The

instructions attached a copy of the aforementioned chart which set forth the

allocation of shares under the 2012 ESOP.  (*Id.* at D Exh 12.)

**F.      Bishay and Bishara Force a Deal**

During January and February, 2014, NetTalk and Bishay continued to

discuss and negotiate the terms by which Bishay (through Telestrata) would invest

in NetTalk.  (Doc 63 – Pg 36.)  In or about late February 2014, Bishay and Bishara

demanded a meeting at NetTalk's offices to discuss the potential transaction.  (Doc

---

[3] NetTalk's Board of Directors approved the implementation of the 2012 ESOP by
written action, dated May 28, 2012.  (Doc 62 – D Exh. 4.)  In the 2012 ESOP,
NetTalk reserved 20 million shares of its common stock for issuance thereunder.
(*Id.* at D Exh 3.)

64 – Pg 123.)  At this meeting, Bishay and Bishara demanded that NetTalk pay

overstated amounts for services previously provided by Iristel and to repay Bishay

amounts far greater than the amounts which he loaned NetTalk.  (*Id.* at 125.)

Bishay and Bishara threatened to cause Iristel to cease providing NetTalk with the

crucial services it needed to operate, including its carrying NetTalk's traffic of

VoIP calls, if it did not accede to the unreasonable and outrageous demands.  (*Id.*

at 123.)

Because NetTalk needed to maintain its relationship with Iristel to continue

servicing its customers, it reluctantly agreed to Telestrata's terms and the

Individual Defendants determined to move forward with the negotiations.  (*Id.* at

124-25.)

### G.    Telestrata Performs Due Diligence

After the late February 2013 meeting, Telestrata undertook to perform due

diligence regarding NetTalk, and the parties continued to negotiate the final terms

of the transaction.  (*Id.* at 128-29.)  Telestrata was represented by counsel at all

times during the due diligence period and requested various documents and

information concerning NetTalk.  (*Id.*)

On March 3, 2014, NetTalk provided Telestrata's counsel with drafts of

various closing documents, as well as schedules containing information about

NetTalk.   (Doc 62 – D Exh 8.)  Among the schedules provided was a

capitalization table of NetTalk as of March 3, 2014 (the "Cap Table").  (*Id.*)  The Cap Table provided that there were 52,048,221 shares of NetTalk's common stock outstanding as of March 3, 2014, and set forth a list of the holders of the stock and the amounts they held.  (*Id.*)  The Cap Table included a line item for the 2012 ESOP issuance of the approximately 10 million shares of stock and indicated that these shares constituted 20.604% of NetTalk's issued and outstanding shares.  (*Id.*)[4]

Although the respective percentages of ownership were allegedly of great importance to Telestrata, Bishay and Bishara were supposedly anxious to close the transaction and merely "glanced" at the Cap Table.  (Doc. 64 – Pgs 12, 44.)[5] Incredibly, neither Bishay nor Bishara inquired any further as to the line item which disclosed the stock issued pursuant to the 2012 ESOP, never inquired as to who received the stock issued from the 2012 ESOP, and never inquired as to whether the Individual Defendants received any stock thereunder.  (Doc 63 – Pg 95).

---

[4] The line item for the 2012 Stock Option Plan on the Cap Table was erroneously listed as the 2013 Stock Option Plan.

[5] Indeed, Mr. Bishara testified that he did not even see the line item for the 2012 Employee Stock Option Plan.  (Doc 64 – Pg 44.)

### H.    The Parties Execute a Restricted Stock and Warrant Purchase Agreement

On March 11, 2014, the parties executed the SPA, which was drafted by Telestrata.  (Doc 62 – P Exh 4; Doc 43-1 – Pg 5.)  As was clearly set forth in the Cap Table, NetTalk had a total of 52,048,221 shares of common stock issued and outstanding at the time immediately prior to the execution of the SPA.   (*Id.* at D. Exh. 8.)  Thus, pursuant to the clear language of the SPA, Telestrata was purchasing 25,441,170 shares of NetTalk's common stock, which represented an amount equal to 48.88% of NetTalk's "current issued and outstanding common stock" (*i.e*., 52,048,221 shares) and a warrant to purchase an additional 20 percent of NetTalk's common stock at a later date.  (*Id.*at P Exh 4 – Pg 1.)

Pursuant to the SPA, Telestrata also received: (i) a secured promissory note in the principal amount of $4.071 million, with a 5 percent interest rate, due and payable on March 1, 2016 (the "Telestrata Note"); (ii) a warrant to purchase an additional twenty percent of NetTalk's common stock on or before March 11, 2015 (the "Telestrata Warrant"); (iii) a security interest, in the NetTalk Property; and (iv) three spots on NetTalk's Board of Directors.  (*Id.* at P Exh 4.)[6]

---

[6] Under the SPA, Mr. Bishay was appointed president of NetTalk, T. Kyraikides was appointed CEO and corporate secretary, Healy was appointed chief financial officer, N. Kyriakides was appointed chief operating officer, Paxinos was appointed chief technology officer and Hosfeld was appointed executive vice president.  (Doc 62 – P Exh 4 – Pg 4.)

Finally, pursuant to the SPA, NetTalk's management, *i.e.*, T. Kyriakides, Healy, N. Kyriakides, Paxinos and Hosfeld, were also granted a warrant on the same terms as the Telestrata Warrant, *i.e.*, 20 percent of the then issued and outstanding stock of NetTalk to Management (the "Management Warrant"), to be created and approved by NetTalk's Board of Directors. (*Id.* at Pg 3.) The NetTalk Board subsequently created and approved the Management Warrant on or about March 14, 2014. (*Id.*, D Exh 17.)

## I.    **KBM and JMJ Invest in NetTalk**

After the SPA closed, NetTalk continued to raise capital as it had done previously, primarily through the issuance of several convertible promissory notes. (Doc 62 – Pgs 67-68.) On or about August, 2014, NetTalk issued a convertible promissory note to JMJ Financial (the "JMJ Note"). (*Id.*) On or about September 24, 2014, NetTalk entered into a securities purchase agreement with KBM Worldwide ("KBM") and issued several convertible promissory notes to KBM (the "KBM Notes"). (*Id.* at D Exh 30.)[7]

A critical requirement under the JMJ and KBM Notes is NetTalk's obligation to reserve a sufficient number of shares of its common stock so that stock will be available if and when the holder converts a portion of principal to

---

[7] Although NetTalk entered into several convertible promissory notes with KBM, because each contains similar provisions, only one note, dated December 15, 2014,was introduced into evidence at the Hearing. (*See* Doc 62 – D Exh 30.)

stock.  (*Id.* at D Exh 30 – Pgs 4-5.)  Under these notes, the reserve requirement is required to be recalculated in the event of a drastic change in the trading price of NetTalk's stock during the life of the notes.  (*Id.*)  Failure to comply with these provisions will result in an event of default under the KBM Notes.  (*Id.*)

### J.    Telestrata Attempts to Take Control of NetTalk

Shortly after the SPA closed in March 2014, Plaintiff, through Counterclaim Defendants, began to engage in various acts of self-dealing for the purpose of gaining control of NetTalk and enriching themselves and Iristel at the expense of NetTalk.  For example, the Telestrata board members insisted on doing business with affiliated companies which overcharged NetTalk and Mr. Bishay frequently requested that NetTalk provide Iristel with false invoices.  (Doc 41-3 – Pg 6.)

Due in part to NetTalk's objections to Telestrata's unlawful and self-interested actions, Plaintiff, through Bishay, Bishara and Aljaswari, resorted to drastic measures, including improperly executing a mortgage on the NetTalk Property without authorization and exercising the Telestrata Warrant in a malicious attempt to gain control of NetTalk. (*Id.* at Pg 10.)  Also, on or about October 14, 2014, Plaintiff exercised the Telestrata Warrant granted to it under the SPA, pursuant to which Telestrata received 19,424,000 shares of NetTalk common stock.  (Doc 62 – D Exh 37.)

Determined to stand their ground in the face of Telestrata's unwarranted actions, the Individual Defendants exercised the Management Warrant, on October 16, 2014, pursuant to which they were granted an additional 25,280,000 shares of NetTalk.  (*Id.* at D Exh 41.)  On the same day, acting through a written shareholder consent pursuant to Fla. Stat. § 607.0808 and Fla. Stat. § 607.0704, a majority of NetTalk's shareholders, constituting 52.27 percent of the voting interests in NetTalk, voted to remove the Counterclaim Defendants from NetTalk's board. (Doc 62 – D Exh 43.) [8]  Plaintiff incorrectly contends that Defendants did not have the requisite authority to do so. (Doc 46 – Pg 7.)

### K.    May 2015 Corporate Actions

On or about May 19, 2015, pursuant to a Written Consent of the Majority of Shareholder of NetTalk, dated May 19, 2015, a majority of approximately 50.2 percent of NetTalk's voting power of common stockholders approved the amendment to increase the authorized shares of common stock from 300,000,000 to 1,000,000,000.   (Doc 43-6 – Pgs 2-5.)  Further, in May, 2015, the Board approved the creation of the 2015 Incentive Stock Option Plan ("2015 ESOP"), and issued to certain Individual Defendants shares of NetTalk stock in lieu of payment for back wages.  (Doc 33-4.)

---

[8] Specifically, 63,456,557 shares of the 121,398,391 shares then outstanding voted for removal.  (Doc 62 – D Exh 43.)

## PROCEDURAL HISTORY

### A.    Plaintiff Commenced this Action

Plaintiff commenced this action on November 5, 2014 by the filing of a Complaint (the "Complaint"), in which Plaintiff asserts a number of individual and derivative claims against Defendants.  (Doc 1.)[9]  In the Complaint, Plaintiff asserts derivative claims for: (1) preliminary and permanent injunction; (2) breach of fiduciary duty; and (3) declaratory judgment. (Id.)  Plaintiff also asserts direct claims for: (1) a declaratory judgment against all Defendants; (2) accounting against NetTalk; (3) breach of the SPA against NetTalk; (4) imposition of an equitable lien against NetTalk; (5) fraud against NetTalk and certain Individual Defendants; and (6) conspiracy against all Defendants. (Id.)[10]

### B.    Defendants Answer and Assert Counterclaims

Thereafter, on May 26, 2015, Defendants filed their Verified Answer and Counterclaims (the "Answer").  (Doc 27.)  In its Answer, NetTalk asserts counterclaims against Telestrata and the Additional Counterclaim Defendants for:

_____

[9] On December 24, 2014, NetTalk commenced a related action against Telestrata in state court to quiet title.  That action has since been removed to the District Court and the two cases have since been consolidated under the Case No. 1:14-cv-24137.

[10] On January 14, 2015, Defendants moved to dismiss the Complaint. The District Court denied Defendants' Motion to Dismiss on July 9, 2015 and Defendants subsequently moved to certify the District Court's order for Interlocutory Appeal on July 13, 2015 (Docs 35, 38.)  Defendants' Motion to Certify for Interlocutory Appeal is still pending before the District Court.

(1) removal of cloud on title; (2) slander of title; (3) breach of fiduciary duty; (4) corporate waste; (5) tortious interference with contract; (6) tortious interference with prospective economic advantage; and (7) conspiracy. (Id.)  On June 16, 2015, Telestrata filed its Answer to the Counterclaims, and on September 9, 2015, Bishay served his Answer to the Counterclaims.  (Docs 31, 77.)

### C.    Plaintiff Moves for a Temporary Restraining Order and a Preliminary Injunction

On July 7, 2015, Plaintiff moved for an *ex parte* Temporary Restraining Order ("TRO") (Doc 33), which the District Court granted on July 8, 2015. (Doc 34.)  Among other things, the TRO enjoined Defendants from taking any actions relating to the issuance or authorization of NetTalk's shares and stayed the implementation of the 2015 ESOP.  (*Id.*)  On July 10, 2015, Plaintiff moved to convert the TRO to a preliminary injunction (Doc 36), and on July 16, 2015, Defendants filed their opposition to Plaintiff's motions and moved to dissolve the TRO.  (Docs 40-43.)  On July 21, 2015, the District Court heard argument on the motions and extended the TRO for an additional 14 days.  (Docs 47-49.)

The District Court subsequently held a three-day evidentiary hearing on Plaintiff's motion for a preliminary injunction on August 3, 4 and 5, 2015 (the "Hearing").  (Docs 59-61.) At the Hearing, the Parties stipulated to limiting the issues before the court to: (1) the ownership interest of the parties before and after the Parties entered into the SPA; (2) the ownership interest of the parties in mid-

- 14 -

October; and (3) evidence concerning the potential harm to Defendants which would arise from issuance of injunctive relief.  (Doc 64 – Pgs 3-4.)  The parties submitted post-hearing briefs on August 13, 2015.  (Docs 66-68.)

### D.    The Order

On August 19, 2015 the District Court (King, J.) issued the Order, which granted Plaintiff's motion for a preliminary injunction in its entirety.  (Doc 69.) Since this date, Defendants have been enjoined from, *inter alia* (1) exercising any rights related to various issued and outstanding shares of common stock in NetTalk; (2) authorizing or issuing any new shares of NetTalk stock or any rights to purchase NetTalk stock; (3) amending NetTalk's Articles of Incorporation absent written consent of a majority of shareholders, including Telestrata; and (4) taking any further action related to issuance, authorization, sale, or purchase of any further shares of stock in the Company, absent further order of the District Court. (*Id.* at 20-21.)

Pursuant to the Order, the District Court held that Plaintiff established each of the four elements necessary for the issuance of a preliminary injunction.  (*Id.* at 7-19.)

First, the District Court held that Plaintiff clearly established that it is likely to prevail on its Fourth Claim for a declaratory judgment that the Individual

Defendants do not own the approximately 10 million shares issued to them as part of the 2012 ESOP and its Eighth Claim for fraud. (*Id.* at Pg 7.)

With respect to the Fourth Cause of Action, the District Court held that because of certain purported "inconsistencies" in the Defendants' testimony and a "delay" in issuing the stock, "the authenticity and legitimacy" of the written action of the Board approving this issuance was "highly suspect". (*Id.* at 10.) Based upon the foregoing, the District Court held that it was:

> unable to determine based upon the limited record before it when [NetTalk] actually decided to grant the 9.9 million shares to the Individual Defendants, and cannot determine, on the basis of the record as it now stands following the [] Hearing, whether the 9.9 million shares were ever properly granted (and documents related to such grant prepared) before or after the closing of the Telestrata transaction.
>
> * * *
>
> Thus, although it is clear that further discovery by both parties may be necessary to develop this issue, based upon the evidence presented at the hearing and in the Motions, the Court believes that it has sufficiently called into question whether any legal grant of the 9.9 million shares ever occurred prior to the closing of the Telestrata transaction, and that Plaintiff will prevail on that claim.

(Doc 69 – Pgs10-11.) Further, the District Court cited no legal authority for its holding that, "because [NetTalk] and the Individual Defendants had a legal duty to disclose to the SEC any transfers of stock made to officers and directors…the absence of any such filings necessarily gives rise to a presumption that such

transfers were not made." (Doc 69 – Pg 11.) In conclusion, the District Court held that, based on the above-determinations, "all subsequent written shareholder actions [taken by Defendants after March 2014] are likewise invalid." (Doc 69 – Pg 11.)

The District Court also held that Plaintiff established that it was likely to succeed on its fraud claim, basing its finding on Bishay's "expectation" that Telestrata would receive a 48.8 percent ownership interest in NetTalk, and that the Individual Defendants would not have majority control of NetTalk post-closing. (Doc 69 – Pgs 12-13.)

Second, the District Court found that Plaintiff established that it would be irreparably harmed in the absence of a preliminary injunction because it may suffer a dilution in its ownership interest, and a commensurate inability to control or participate in the business. (Doc 69 – Pgs 13-14.) The District Court explicitly acknowledged that the issue of whether a diminution of ownership could constitute irreparable harm was a matter of first impression within the 11th Circuit. (Doc 69 – Pg .14)

Third, the District Court held that Plaintiff established that a balance of the harms weighs in its favor. (Doc 69 – Pgs16-18.) The District Court reasoned that, because Defendants only presented evidence that concerned harm to NetTalk – and not to the Individual Defendants – Plaintiff had therefore "conclusively shown"

- 17 -

that any harm to the Individual Defendants was outweighed by harm to Plaintiff. (Doc 69 – Pg16.)

Fourth, the District Court held that Plaintiff established that it was in the public interest to grant the preliminary injunction. (*Id.* at 18-19.) The District Court determined that if it did not enter the injunction and allow additional shares to be authorized, "the ownership and control of [NetTalk] would be thrust into chaos" if it was later determined that such authorization was unlawful. (*Id.* at 18-19.)

Finally, the District Court set the bond amount at $10,000, a sum intended to cover Defendants' costs of preparing for the Hearing. (*Id.* at 19.) The District Court again entirely disregarded the evidence presented by Defendants regarding the damages it would suffer, finding that the evidence concerning NetTalk's enterprise value of NetTalk was speculative. (*Id.*)[11]

On August 26, 2015, Defendants timely filed their Notice of Appeal of the Order. (Doc 73.)

---

[11] In the Order, the Court incorrectly stated that "Defendants speculated that that the enterprise value of NetTalk was approximately $900,000 and therefore requested a $1,000,000 bond." (Doc 69 – Pg 19.) Healy, however, testified that the enterprise value of NetTalk was approximately $4,500,000 to $5,000,000. Accordingly, Defendants requested a bond of $5,000,000 – not $1,000,000. (Doc 65 – Pg 85.)

- 18 -

# SUMMARY OF THE ARGUMENT

In this action between two factions of shareholders of NetTalk, Plaintiff asserts derivative and direct claims against Defendants alleging that, among other things, Plaintiff is entitled to a controlling interest in NetTalk and it has wrongfully been denied control of NetTalk  Almost eight months after the commencement of this action, Plaintiff moved for a preliminary injunction to prohibit Defendants from, *inter alia*, amending its certificate of incorporation to increase its authorized shares, from issuing any stock, and from utilizing and voting certain shares that were previously issued to the Individual Defendants.  For the reasons set forth below, the District Court erred in granting Plaintiff's motion for a preliminary injunction.

As a threshold matter, throughout the Hearing and the subsequent Order, the District Court improperly placed the burden of persuasion on Defendants to disprove the merits of Plaintiff's claims and establish that NetTalk would be irreparably harmed if the injunction were to issue.  Such an error is subject to broad, *de novo* review by this Court.

Even putting aside the District Court's misapplication of the burden, Plaintiff failed to establish the necessary elements for a preliminary injunction. First, contrary to the District Court's finding, Plaintiff failed to establish that it was likely to succeed on the merits of its claims for declaratory relief and fraud.

As to its Fourth Claim, which seeks a declaration that the shares issued to the Individual Defendants under the 2012 ESOP were invalid, the evidence presented by Defendants conclusively established that the shares owned by Individual Defendants were validly awarded in December 2013 and issued in early March 2014. No competent affirmative proof was presented by Plaintiff that demonstrated that these shares were not validly issued.

Similarly, Plaintiff failed to establish that it is likely to succeed on its Eighth Claim for fraud based upon alleged misrepresentations that it was receiving a controlling interest in NetTalk. As discussed below, any purported reliance on any such misrepresentations or preliminary agreements was unreasonable as a matter of law because they superseded and contradicted by the express terms of SPA.

Second, the Court erroneously determined that Plaintiff established that it would suffer irreparable harm in the absence of a preliminary injunction based upon the dilution of its ownership position by issuances of stock. Initially, the Court entirely ignored Plaintiff's unexplained eight month delay in seeking preliminary injunctive relief. Such a delay, on its own, precludes a finding or irreparable harm.

Also, Plaintiff cannot establish any irreparable harm because, as a minority shareholder in NetTalk with no anti-dilution protection, its position would not change as a result of any dilutive stock issuance. Moreover, any harm by reason of

NetTalk's amendment of its certificate of incorporate to increase in authorized shares is entirely speculative it merely *authorizes* – not issues – more shares of stock.

Third, the District Court's determination that Plaintiff established that a balance of the harms tipped in favor of Plaintiff was in error. Indeed, the evidence at the Hearing demonstrated that the balance of harms weighed decided in favor Defendants. The evidence demonstrated that a preliminary injunction would, *inter alia*, cause defaults under numerous obligations of Defendants, prevent Defendants from curing such defaults, and would likely result in NetTalk's demise. Plaintiff, on the other hand, could show nothing more than a potential dilution of its minority ownership interest in NetTalk.

Finally, the District Court erred in setting the security required for the issuance of the preliminary injunction at $10,000. In finding that this nominal amount was sufficient to cover the costs of preparing for the Hearing, the District Court improperly failed to consider evidence regarding the enterprise value of NetTalk and the drastic harm to NetTalk that would likely result from the grant of a preliminary injunction.

Accordingly, for all the foregoing reasons, this Court should reverse the Order and vacate the preliminary injunction in its entirety.

## STANDARD OF REVIEW

This Court reviews a district court's order granting or denying a motion for a preliminary injunction for an abuse of discretion. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). In reviewing the decision, this Court reviews findings of fact for clear error, and legal conclusions *de novo*. *Forsyth County v. U.S. Army Corps of Engineers*, 633 F.3d 1032, 1039 (11th Cir. 2011).

"This scope of review will lead to reversal if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005) "[I]f the district court misapplied the law, its conclusions are subject to broad review." *Statewide Detective Agency v. Miller*, 115 F.3d 904, 906 (11th Cir.1997)

Accordingly, this Court must review the District Court's Order granting Plaintiff's motion for a preliminary injunction and determine whether it employed the correct legal standard in issuing the injunction, whether it abused its discretion in applying that standard, or whether it based its conclusions on clearly erroneous or unreasonable findings of fact. *See Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1526 (11th Cir. 1994*); E. Remy Martin & Co. v. Shaw-Ross Int'l Imports*, 756 F.2d 1525, 1529 (11th Cir. 1985).

## ARGUMENT AND CITATIONS OF AUTHORITY

## I.   THE DISTRICT COURT ERRED IN GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

As this Court has recognized, a preliminary injunction is an extraordinary and drastic remedy, "and the boundaries within which the district court may exercise its discretion are clearly marked." *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1354 (11th Cir. 1983).  A preliminary injunction should only issue if the movant "clearly satisfies" each of the following four prerequisites: (1) a substantial likelihood that that the movant will prevail on the merits of its claim; (2) that the movant will suffer irreparable harm in the absence of a preliminary injunction; (3) that the threatened injury to the movant outweighs the potential damage the proposed injunction may cause the non-moving party; and (4) that if the injunction issues, it will not be adverse to public  policy.  *Id.  See also Four Seasons Hotel & Resorts, BV v. Consorcio Barr, SA*, 320 F.3d 1205, 1210 (11th Cir. 2003)

Therefore, in the 11th Circuit, a motion for a preliminary injunction must be denied if the moving party fails to meet even one of the four prerequisites.  *See Warsteiner Imp. Agency, Inc. v. Republic Nat'l Distrib. Co*., LLC, 2008 WL 4104568, *4 (M.D. Fla., Jul. 31, 2008)

It is well-established that the party seeking injunctive relief has the burden of persuasion as to all four elements.  *CBS Broadcasting, Inc. v. EchoStar*

*Commc'ns Corp.*, 265 F.3d 1193, 1200 (11th Cir.2011)  The reversal of this burden is improper and will result in the preliminary injunction being reversed or remanded for further findings of fact.  *Canal Authority v. Callaway*, 489 F.2d 567, 574 (5th Cir.1974) (in remanding the case, the appellate court held that it was improper for the district court to place the burden of persuasion on defendants to prove that they would suffer irreparable harm.)

As discussed more fully below, the District Court erroneously granted the preliminary injunction because it misapplied the applicable legal standard and because Plaintiff failed to carry its burden of clearly establishing any of the first three perquisites for preliminary injunctive relief.

### A.    Plaintiff Did Not Establish a Likelihood of Success on its Fourth and Eight Causes of Action

In the Order, the Court found that Plaintiff established a likelihood of success on the merits of its Fourth Claim for declaratory relief and its Eighth Cause of Action for fraud.  (Doc 69 – Pg 7.)[12]  This finding was erroneous.

The movant must first establish a likelihood of success on the merits of its claims in order to be entitled to a preliminary injunction under Fed. R. Civ. P. 65. *Bloedorn v. Grube*, 631 F,3d 1218, 1229 (11th Cir. 2011).  "It is not enough that a

---

[12] Florida law controls Plaintiff's claims because the SPA is governed by Florida law (Doc 62 – P Exh 4 – Pg 23) and Florida has the most significant relationship to Plaintiff's claims. *See Grupo Televisa, S.A. v. Telemundo Commun. Grp. Inc.*, 486 F.3d 1233, 1240 (11th Cir. 2007).

merely colorable claim is advanced." *Southern Wine & Spirits of Am., Inc. v. Simpkins*, 2011 WL 124631, *2. (S.D. Fla., Jan. 14, 2011).

The likelihood of success on the merits element is "generally regarded as the most important because the granting of a temporary restraining order would be inequitable if the movant has no chance of succeeding on the merits of the case." *Butler v. Alabama Jud'l Ing. Comm'n*, 111 F. Supp. 2d 1224, 1229-30 (M.D. Ala. 2000) (citation omitted). *See also CBS Broadcasting, Inc. v. EchoStar Commc'ns Corp.*, 265 F.3d 1193, 1202 (11th Cir.2011). ("[T]he fixed principle in the preliminary injunction context is that the proponent of such an injunction must always make the ***prima facie showing*** of substantial likelihood of success on the merits") (emphasis added)  Thus, a motion for a preliminary injunction ***must*** be denied if the movant fails to demonstrate a likelihood of success on the merits. *Butler*, 111 F.Supp.2d at 1229-30.

### 1. The District Court Erroneously Determined That Telestrata Met its Burden of Establishing it is Likely to Succeed on its Fourth Cause of Action

In determining that Plaintiff established that it is likely to succeed on its declaratory judgment claim for a declaration of the respective percentages of ownership of the parties in NetTalk, the District Court misapplied the burden of proof and then ignored the evidence that Defendants presented.

Plaintiff's Fourth Claim for declaratory judgment against all Defendants seeks a declaration of the amount of shares owned by the Individual Defendants. (Doc 1 – Pg 24.) This claim rest entirely upon the assertion that the approximately 10 million shares issued to the Individual Defendants under the 2012 ESOP were not validly issued to them.  (Doc 69 – Pg 8.)  Based upon the foregoing, Plaintiff contends that it is entitled to a judicial declaration that all actions taken by majority written consent of NetTalk's shareholders after the parties executed the SPA are invalid. (Doc 46 – Pg 7.)

Instead of looking to Plaintiffs to prove their veracity of their claims, the District Court improperly placed the evidentiary burden upon Defendants to conclusively establish that Plaintiff would not succeed on this cause of action by demonstrating that the issuance under the 2012 ESOP was valid.  Defendants offered ample documentary evidence and testimony – which was accepted by the District Court – to establish that the 2012 ESOP shares were regularly and validly issued to the Individual Defendants.

The District Court's improper application of the burden is clear because its determination is based entirely upon a finding that the "authenticity and legitimacy" of evidence presented by Defendants was "highly suspect".  (Doc 69 – Pg 10.)  Further, the District court found that Plaintiff had "sufficiently called into

question whether any legal grant of the 9.9 million shares ever occurred prior to the

closing of the Telestrata transaction . . ." (*Id.* at 10-11.)

Notwithstanding the foregoing, Defendants presented the following evidence

to establish that the shares owned by Individual Defendants were validly awarded

in December 2013 and issued in early March 2014.  At the Hearing, Defendants

presented a Written Action of NetTalk's Board of Directors, dated December 18,

2013, ratifying the issuance of over 10 million shares of NetTalk's common stock

to the Individual Defendants and other employees of NetTalk under the 2012

ESOP.  (Doc 62 – D Exh 7.)  Further, T. Kyriakides, a member of NetTalk's

Board, testified that he executed the document and was involved in the decision to

issue the shares in December 2013. (Doc 65 – Pg 57.)  He further testified that he

caused an Issuance Instruction Form, dated March 4, 2014, to be sent to NetTalk's

transfer agent which directed NetTalk's transfer agent to issue the approximately

10 million shares and to indicating whom they should be issued. (Doc 62 – D Exh

12.)

Despite the foregoing evidence, the District Court found the validity of the

grant under the 2012 ESOP questionable.  (Doc 69 – Pg 10.)  The Court based this

conclusion on certain purported "undisputed" facts and certain testimony presented

by Defendants that purportedly made the District Court suspicious as to the

validity of the grant and issuance of shares under the 2012 ESOP.  (*Id.* at 8-10.)

For example, the District Court found that it was not disputed that the Individual Defendants did not disclose they owned the approximately 10 million shares issued to them under the 2012 ESOP to the SEC, or to Telestrata.  (*Id.* at 8-9.)  The District Court also found that it was supposedly undisputed that prior to October 17, 2014, Telestrata was not aware that the 9.9 million shares under the 2012 ESOP had been issued to the Individual Defendants.  (*Id.*)[13]

The Court also noted that T. Kyriakides did not immediately recall on direct examination having attended any Board meeting in December 2013 at which a resolution was made to issue the 9.9 million shares and that there was a two and a half month delay in issuing the shares after they were awarded.  (*Id.* at 10.)[14] Based on an affidavit of NetTalk's transfer agent, the 2012 ESOP shares had been issued at the end of March 2014.  (Doc 42-1 – Pg 2.)

Based upon the foregoing – and *not* any direct evidence presented by Plaintiff – the District Court made an unwarranted leap from finding that the December 18, 2013 Written Action (Doc 62 – D Exh 7) was "highly suspect" to

---

[13] Contrary to the District Court's finding, Defendants did (and continue to) dispute that Plaintiff's contention that it was not aware that the Individual Defendants received stock from the issuance pursuant to the 2012 ESOP based on their knowledge that the Individual Defendants were NetTalk employees.  (Doc 67 – Pgs 11-12; Doc 63 – Pg 95.)

[14] Although the District Court found that T. Kyriakides's testimony cast doubt on the validity of the document, on redirect the record clearly establishes that the stock was issued pursuant to a written board action on December 18, 2013 (Doc 65 – Pg 63.)

concluding that Plaintiff had called into question the validity of the Individual Defendants' interest in NetTalk to such an extent that it had established a likelihood of success on merits of its claims.  (Doc 69 – Pgs 10-11.)  The District Court then went a step further and held that, because Plaintiff was likely to prevail on its claim that the shares were not validly issued under the 2012 ESOP, "all of the subsequent written shareholder actions likewise are invalid."  (*Id.* at 11.)

     The District Court's conclusion was in error as the foregoing "evidence" does not establish that Plaintiff is likely to succeed.  Indeed, Plaintiff presented no affirmative proof in support of its claim.  Rather, the District Court erroneously relied on minor inconsistencies in documents and testimony presented by Defendants to support its conclusion that Plaintiff established its burden.  (*Id.* at 9-11.)  Plaintiff, however, cannot meet its high burden of establishing a likelihood of success by merely pointing out such inconsistencies, and it is reversible error to find that it did.

     Further, the District Court provided no legal support for its assertion that a failure to make regulatory disclosures creates a presumption that the underlying transaction did not occur.  (*Id.* at Pg 11.)  To the extent the Court relied on the fact that the Individual Defendants failed to disclose to the SEC their acquisition of the 10 million shares received pursuant to the 2012 ESOP in finding that Plaintiff was likely to succeed on its claim that the shares were not validly issued, such reliance

was misplaced. (*Id.*) Even if the disclosure was required, Defendants' failure to meet any such SEC reporting obligations does not affect the validity of the transaction, or the shares granted to them pursuant to the 2012 ESOP.

Based upon the foregoing, the District Court first erred in reversing the burden of proof and making its determination based solely on the sufficiency of evidence presented by Defendants. Next, the District Court disregarded the evidence before it in erroneously finding that the issuance of the 9.9 million shares to the Individual Defendants was invalid. Finally, the District Court based its conclusions as to this element on the unsupported legal proposition that a failure to make SEC disclosures somehow affects the validity of the underlying event.

Accordingly, this Court should find that the District Court erred in concluding that Plaintiff established that it was likely to succeed on its Fourth Cause of Action.

### 2.     Plaintiff Failed to Establish That it is Likely to Succeed on its Fraud Claim

The District Court also erred in finding that Plaintiff established that it was likely to succeed on its Eighth Cause of Action which purports to assert a claim for fraudulent inducement against NetTalk and certain Individual Defendants. (Doc 1 – Pg 26.) Plaintiffs' fraudulent inducement claim, as described by the District Court, arises from alleged misstatements concerning the ownership capitalization

table of NetTalk and Plaintiff's subjective intention that was purchasing a

controlling ownership interest in NetTalk.  (Doc 69 – Pg 12.)

To establish a claim for fraud under Florida law, a plaintiff must

demonstrate: (1) a false statement of material fact; (2) known by the person making

the statement to be false when made; (3) made for the purpose of inducing the

plaintiff to act upon it; and (4) that plaintiff suffered injury in reliance on the

representation.  *See Hillcrest Pacific Corp. v. Yamamura*, 727 So.2d 1053, 1056

(Fla. DCA 4th Dist. 1999); *see also G Barrett LLC v. The Ginn Co.*, 2011 WL

6752551, *4 (M.D. Fla., Dec. 13, 2011) (applying Florida law).

Plaintiff did not, and cannot, establish that it is likely to prevail on its fraud

claim.  As discussed more fully below, Plaintiff's claim will ultimately fail as a

matter of law because it could not have reasonably relied upon the alleged oral

misrepresentations.

      a.  Any Alleged Reliance on a Misrepresentation
          Concerning the Percentage of Ownership
          of NetTalk that Plaintiff Would Receive
          <u>Under the SPA was Unreasonable as a Matter of Law</u>

Although under Florida law justifiable reliance is not a necessary element of

fraud, courts nevertheless require reliance to be reasonable.  *See Creative Am. Ed.,*

*LLC v. The Learning Experience Sys., LLC*, 2015 WL 2218847, *8 (S.D. Fla., May

11, 2015); *G Barrett LLC*, 2011 WL 6752551, at *4.[15]  A party may not blindly

rely upon a fraudulent statement.  *See Addison v. Carballosa*, 48 So.3d 951, 955

(Fla. DCA 3rd Dist. 2010).  Thus, if the falsity of the statement is obvious, there

can be no reliance, and thus no cause of action for fraud.  *See id*; *see also M/I

Schottenstein Homes, Inc. v. Azam*, 813 So.2d 91, 95 (Fla. 2002) (Court held that

"there may be cases in which the falsity of the statement is obvious, and under

those circumstances no cause of action could be stated [for fraud] . . ."); *Norman v.

Padgett*, 125 So.3d 977, 978 (Fla. DCA 3rd Dist. 2013) ("The recipient of a

fraudulent misrepresentation is not justified in relying upon its truth if he knows

that it is false or its falsity is obvious to him") (citation omitted).

     With these principles in mind, Florida courts have consistently held that "[a]

party cannot recover for fraud for alleged oral misrepresentations that are covered

in or contradicted by the terms of a later written contract."  *See Ioannides v.

Romagusa,* 93 So.3d 431, 435 (Fla. DCA 4th Dist. 2012).  *See also Hillcrest Pac.

Corp. v. Yamamura*, 727 So.2d 1053, 1056 (Fla. DCA 4th 1999).  Indeed, reliance

on an alleged fraudulent representation is unreasonable as a matter of law when

such representation is contradicted by the express terms of a written agreement.

---

[15] Certain courts in this Circuit have described Florida law concerning the reliance element of a fraud claim as "murky"  *See, e.g. G Barrett LLC*, 2011 WL 6752551, at *4.  As explained by one court, the reason it is "murky" is because although the Florida Supreme Court has held that justifiable reliance is not an element, a number of state and federal courts have inserted a requirement of justifiable reliance.  *See Creative Am. Ed., LLC*, 2015 WL 2218847, at *8.

*See Mac-Gray Servs., Inc. v. DeGeorge*, 913 So.2d 630, 634 (Fla. DCA 4th Dist. 2005) *Elbow River Mktg. L.P. v. Clean Fuel Lakeland, LLC,* 2010 WL 5209345 (M.D. Fla., Dec. 16, 2010) (same).

For example, in *Ioannides*, the defendant, a dermatologist, allegedly recruited the plaintiff, also a dermatologist, to open a satellite office and work with him under a three-year contract.  93 So.3d at 432.  The plaintiff allegedly entered into a written employment agreement based upon the defendant's representation that the plaintiff's compensation would easily exceed $500,000 per year.  *Id.*

After the relationship soured, the plaintiff commenced an action against the defendant, alleging that, *inter alia***,** the defendant fraudulently induced the plaintiff into entering into the employment contract by misrepresenting that he would earn in excess of $500,000 per year.  *Id.*  The court held that the plaintiff could not establish a fraud claim based upon misrepresentations concerning compensation.  *Id*. at 435.  In so holding, the *Ioannides* court recognized the well-established rule under Florida law that a party cannot recover in fraud for alleged oral misrepresentations that are contradicted or adequately covered in a later written agreement.  *Id. (*citing *Hillcrest*, 727 So.2d at 1056).  The Court found that "given the specific provisions in the contract detailing [plaintiff's] salary and formula for computing bonuses, [he] cannot recover in fraud for alleged oral statements about alleged earnings made prior to entering into the contract."  *Id.*; *See also Mac-Gray*,

913 So.2d at 634 (the purchaser of a business could not establish a fraud claim based upon representations concerning expected income because such representations were at variance with the written contract).

Here, even assuming there was an oral misrepresentation regarding the percentage of ownership of NetTalk that Telestrata would receive in the transaction, the Court overlooked the fact that the plain language of the SPA directly contradicted such a representation.

First, the second paragraph of the SPA specifically provided that Plaintiff was purchasing 25,441,170 shares of NetTalk's stock.  (Doc 62 – P Exh 4 – Pg 1.) Thus, under the SPA, Telestrata was clearly purchasing a specific number of shares of NetTalk's stock – not a particular percentage thereof. The SPA then provides that the 25,441,170 shares of stock "represented 48.88% of the *current* issued and outstanding Common Stock of [NetTalk]".[16] (*Id.* at P Exh 4 – Pg 1) (emphasis added).  In other words, the 25,441,170 shares represented 48.88 percent of the outstanding stock of NetTalk *at the time of* the closing of the SPA.

Second, the Cap Table provided to Plaintiff during the due diligence period of the transaction set forth that there were 52,048,221 shares of NetTalk's stock

---

[16] Under the SPA, Plaintiff also received the Telestrata Warrant which entitled it to twenty-percent of the issued and outstanding shares of NetTalk at the time it is exercised. (Doc 62 – P Exh 4 – Pg 1.)

issued and outstanding as of March 3, 2014.  (*Id.* at P Exh 3.)[17]  Accordingly, only a simple math equation is necessary to show that the 25,441,170 shares Telestrata would receive equaled 48.88 percent of the 52,048,221 total shares disclosed on the Cap Table.[18]  Pursuant to the express terms of the SPA, Plaintiff's 25,441,170 shares were to be newly issued from NetTalk's treasury.[19]  Therefore, immediately following the closing of the SPA, there were 77,489,391 shares of NetTalk's stock issued and outstanding, *i.e.*, the total of 52,048,221 shares prior to closing plus 25,441,170 issued to Plaintiff pursuant to the SPA.  Accordingly, ***Plaintiff's ownership interest was 32.8 percent*** – not 48.88 percent.

As a result, Plaintiff could not have relied upon any purported oral representation that it was receiving a 48.88 percent ownership interest in NetTalk as part of the transaction (as well as the Telestrata Warrant for an additional twenty percent) because such representation is directly contradicted by the plain language of the SPA.  Therefore, the District's Court's focus on Telestrata's unilateral belief

---

[17] Further, the Cap Table was also included as a schedule to the SPA.  (Doc 62 – P Exh 4 – Pg 4.)

[18] Included in the 52,048,221 total shares disclosed was the approximately 10 million shares issued under the 2012 ESOP.  (Doc 62 – P Exh 3.)

[19] "[A]t the Closing […] the Company hereby agrees ***issue and sell*** to Purchaser, and Purchaser agrees to purchase from the Company, the purchased shares…" (Doc 62 – P Exh 4 – Pg 1.) (emphasis added)

that it would receive a 48.88 percent ownership interest in NetTalk as support for the fraud claim is misplaced.[20]

Notwithstanding such a purported belief, as in *Ioannides* and *Mac-Gray*, any reliance upon such a representation is also unreasonable as a matter of law because it is contradicted by the express terms of the SPA. Indeed, the SPA provides that it represents "the full and entire understanding and agreement between the parties with respect to the subjects hereof." (*Id.* at P Exh 4 – Pg 24.) Therefore, to the extent that Plaintiff relies on preliminary documents such as the LOI – any such agreements are superseded by the SPA.

Further, any representation that Telestrata would receive a 48.88 percent ownership interest in NetTalk was obviously false and could not have been relied upon by Plaintiff. Pursuant to the SPA, Plaintiff represented that it was a sophisticated "accredited investor" and that it had a sufficient opportunity to "ask questions of and receive answers from, the Company and its management regarding the terms and conditions of this investment." (*Id.* at P Exh 4 – Pg 15.) Despite its contention, Plaintiff knew how many shares were outstanding when it executed the SPA and that it was purchasing 48.88 percent of that number.

---

[20] The District Court found that "[d]uring the hearing, Mr. Bishay [] credibly testified that he had always negotiated with the Defendants concerning the transaction in terms of percentages of ownership, and made clear to them his expectation that Telestrata would own 48.88% of NetTALK following the consummation of the transaction on March 11, 2014." (Doc 69 – Pg 12.) (*See also*, Doc 64 – Pg 41.)

Plaintiff's contention that it purchased a majority ownership interest in NetTalk is

merely a retroactive attempt to seize control of the company.

Based upon the foregoing, Plaintiff could not have reasonably believed it

was purchasing a majority ownership interest in NetTalk. Accordingly, the District

Court's finding that Plaintiff failed to establish that it is likely to succeed on the

merits of its fraud claim should be reversed.

> b. Plaintiff Could Not Have Relied Upon Any
> Alleged Representation Concerning Defendants'
> Percentage of Ownership in NetTalk

The Court also found that Plaintiff was likely to succeed on a claim for fraud

based upon Defendants' purported representation that the Individual Defendants

would not own a majority of NetTalk after the closing of the SPA. (Doc 69 – Pgs

12-13.) The Court's determination was erroneous because Defendants made no

such representation and Plaintiffs failed to conduct adequate due diligence.

Under Florida law, "a misrepresentation is not actionable where its truth

might have been discovered by the exercise of ordinary diligence." *Addison*, 48

So.3d at 955. *See also L&L Doc's, LLC v. Florida Div. of Alcholic Bev. &*

*Tobacco*, 882 So.2d 512, 515 (Fla. DCA, 4th Dist. 2004) (Court held that the buyer

of a business could not have relied upon a misrepresentation which they knew or

should have known was false, with the exercise of some reasonable diligence).

Therefore, in an arm's length business transaction, where there is no duty imposed

on either party to act for the benefit or protection of the other party, or to disclose

facts that the other party might have discovered by its own diligence, there is no

viable fraud claim where the truth could have been discovery with ordinary

diligence.  *See Woods v. On Baldwin Pond, LLC*, 2014 WL 4791990, *5 (M.D.

Fla., Sep. 19, 2014).   As the Court explained in *Jaffe v. Bank of Am., N.A.*,

"[e]very person must use reasonable diligence for his own protection."  *See also*

*M/I Schottenstein Homes, Inc*., 813 So.2d at 93, 95 (where a party has the

opportunity to make a cursory examination or inspection and he fails to do so, he

cannot recover for fraud).

    In the Order, the District Court credited the testimony of Mr. Bishay and Mr.

Bishara that the respective percentage of ownership of the Parties was of utmost

importance in the transaction.  (Doc 69 – Pg 12.)  Plaintiff further claimed at the

Hearing that, had it known that the Individual Defendants were receiving stock

under the 2012 ESOP, it would not have entered into the SPA. (Doc 63 – Pg 46.)

    However, despite the alleged importance of this information, the evidence at

the Hearing established that Plaintiff failed to use ordinary diligence in

determining the Individual Defendants' percentages of ownership in NetTalk.

Indeed, had Plaintiffs used ordinary diligence, they would have learned that the

Individual Defendants were receiving stock under the 2012 ESOP.

It is undisputed that, prior to the closing of the SPA, Plaintiff received the Cap Table, which included a line item that clearly discloses that the 10 million shares of NetTalk's stock was issued under the 2012 ESOP.  (Doc 62 – Def Exh 8.) The 2012 ESOP stock amounted to more than twenty percent of the issued and outstanding stock of NetTalk prior to the closing of the SPA.  (*Id.*)  While this line item did not break down which employees were receiving stock under the 2012 ESOP, Mr. Bishay knew the Individual Defendants were employees of NetTalk and entitled to receive stock pursuant to the 2012 ESOP.  (Doc 63 – Pg 95; Doc 62 – P. Exh. 3; D. Exh. 8.)

Notwithstanding the fact that the Cap Table disclosed that 10,724,000 shares were being issued under the 2012 ESOP, it is undisputed that Messrs. Bishay and Bishara never once inquired as to whether the Individual Defendants would receive stock under the 2012 ESOP, or who was getting the stock under the 2012 ESOP as listed on the Capitalization Table. (*Id.* at 95.)

As a result of the foregoing, Plaintiff failed to establish that it reasonably relied upon any alleged misrepresentation concerning the percentage of the Individual Defendants' stock ownership in NetTalk.  Accordingly, the District Court erred in finding that Plaintiff carried its burden of clearly establishing that it is likely to succeed on the merits of its fraud claim.  Thus, the Order should be reversed.

**B.    The District Court Erred in Finding that
        Plaintiff Established that it Would Suffer
        Irreparable Harm Absent a Preliminary Injunction**

The District Court erroneously held that Plaintiff established that it would be irreparably harmed absent an injunction because its ownership interest would be diluted and it would lack of control over the affairs of NetTalk.  (Doc 69 – Pg 14.) Irreparable harm is "the *sine qua non* of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Thus, even if Plaintiff was able to establish a likelihood of success on the merits, the absence of the likelihood of irreparable harm, standing alone, mandates denial of a motion for a preliminary injunction. *See id.*

The moving party must make a clear showing of a substantial, actual and imminent irreparable harm, as opposed to a conjectural or hypothetical threat of future injury. *FHR TB, LLC v. TB Isle Resort, LP*, 865 F. Supp. 2d 1172, 1206 (S.D. Fla 2011). Only an injury that cannot be remedied by money damages may be considered irreparable. *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). As the Supreme Court has held:

> Mere injuries, however substantial, in terms of money, time, and injury necessarily expended in the absences of a stay are not enough. The possibility of adequate compensatory of [that] other relief will be available at a later date, in the course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974)

As discussed below, Plaintiff failed to meet its burden of establishing that it would suffer irreparable harm in the absence of a preliminary injunction.

**1.    Plaintiff's Unexplained Eight Month Delay in Seeking Injunctive Relief Precludes <u>a Finding of Irreparable Harm</u>**

In finding that Telestrata demonstrated that it would be irreparably harmed in the absence of a preliminary injunction, the Court overlooked, and entirely failed to address, Telestrata's unexplained substantial delay in seeking preliminary injunctive relief.  In determining whether harm is irreparable, courts consider as a factor whether the party seeking the preliminary injunction delayed in seeking relief. *U.S. Bank Nat'l Ass'n v. Turquoise Props. Gulf, Inc.*, 2010 WL 2594866, *4 (S.D. Ala., Jun. 18, 2010). In *Tobnick v. Novella*, the Southern District of Florida observed that:

> [P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic speedy action. . . . Delay, or too much of it, indicates that the suit or request for injunctive relief is more about gaining an advantage (either a commercial or litigation advantage) than protecting a party from irreparable harm. . . .

2015 WL 1526196, at *7  (S.D. Fla., Apr. 2, 2015) (citations and internal quotations omitted) (Court held that the plaintiffs' delay in seeking injunctive relief was fatal to any claim of irreparable harm).

Therefore, it is well settled that delay standing alone may preclude a finding of irreparable harm and the granting of a preliminary injunction. *See Mobile County Water, Sewer & Fire Prot. Auth. v. Mobile Area Water & Sewer Sys., Inc.,* 2007 WL 3208587, *6 (S.D. Ala., Oct. 29, 2007). *See also Burger v. Hartley*, 2011 WL 6826645, *2 (S.D. Fla., Dec. 28, 2011) (delay, standing alone, may preclude the granting or preliminary injunction). Indeed, if a plaintiff has already been subjected to the alleged harm caused by the defendant's conduct for a significant period of time, he cannot credibly assert that "pressing hardship requires injunctive relief" pending the resolution of the action. *See Taylor v. Biglari*, 971 F. Supp.2d 847, 853 (S.D. Ind. 2013).

While there is no bright line rule as to the amount of delay that will preclude a finding of irreparable harm, courts have consistently found that delays equal to or less than the eight month delay at issue here preclude a finding of irreparable harm. *See Structural Tenting Corp. v. The Termite Doctor*, 2010 WL 1650910, *2 (S.D. Fla., Jun. 30, 2010) (an eight month delay between filing complaint and moving for a preliminary injunction precluded a finding of irreparable harm); *U.S. Bank Nat'l*, 2010 WL 2594866, at *4 (a delay of four months undercut plaintiff's request for a preliminary injunction); ; *Tough Traveler, Ltd. v. Outbound Prods*., 60 F.3d 964, 968 (2d Cir. 1995) (a six month delay precluded finding of irreparable harm);

- 42 -

*Schaffer v. Globe Protection, Inc.,* 721 F.2d 1121, 1123 (7th Cir. 1983) (a two

month delay weighed heavily against granting inunction).

Here, the irreparable harm Plaintiff contends that it will suffer is the dilution

of its ownership and control in NetTalk due to the alleged improper issuance of

stock to the Individual Defendants under the 2012 ESOPs.  (Doc 69 – Pg 14.)

Plaintiff, however, has contested this issue since this action was commenced in

November 2014.  Indeed, in the Complaint, Plaintiff contests the ownership of the

approximately 10 million shares issued to the Individual Defendants under the 2012

ESOP.  (Doc 1 – Pg 17.)  Thus, in the Fourth Cause of Action, Plaintiff seeks a

declaratory judgment to declare the "proper amount of shares owned by the

[Individual Defendants]."  (*Id.* at 24.)  Further, in the Complaint, Plaintiff seeks

injunctive relief to prohibit Defendants from taking corporate actions due to the

disputes, *inter alia*, regarding the propriety of the removal of the Telestrata

directors.  (*Id.* at 22.)  Thus, Plaintiff is in the same position now, and subject to the

same purported harm, as it was more than eight months ago when this action was

commenced.

Although Plaintiff failed to offer any explanation or justification for its delay,

the District Court awarded Plaintiff such drastic injunctive relief.  (Doc 69 – Pgs

20-21.)  This Court should find Plaintiff's unreasonable delay, standing alone, is

fatal to its claim that it will suffer irreparable harm.  Accordingly, this Court should

find that the District Court erred in finding that Plaintiff established that it would be irreparably harmed, and should reverse the District Court's grant of a preliminary injunction.

> **2.    The District Court Erred in Determining that the Past Alleged Dilution and Potential Future Dilution of Plaintiff's Ownership Interest in NetTalk <u>Constitutes Irreparable Harm</u>**

Also, Plaintiff cannot establish any irreparable harm because, as a minority shareholder in NetTalk with no anti-dilution protection, its position would not change as a result of any dilutive stock issuance.  In the Order, the District Court acknowledged that no Florida courts have considered whether the dilution of ownership, or substantial changes to ownership and control, of a corporation constitute irreparable harm.  (*Id.* Pg 14.)  Relying exclusively on cases from outside the 11th Circuit, the District Court erroneously found that Plaintiff established that it would be irreparable harmed as a result of the board removals or an increase in NetTalk's authorized shares of common stock from 300,000,000 to 100,000,000. (*Id.* at 14-16.)

First, to the extent that the District Court found irreparable harm based upon the alleged dilution of its ownership interest in NetTalk, it was in error.  (*Id.* at 14.) Although courts in this Circuit have not addressed the issue of whether past dilution can constitute irreparable harm, other courts have held that past dilution of an equity interest cannot form the basis of preliminary injunctive relief.  *See CWIE,*

*LLC v. Bandwith Consulting, Inc*., 2009 WL 1110479, *11 (C.D. Cal., Apr. 20, 2009). *See also Louisiana Mun. Police Emp. Ret. Sys.,* 886 F. Supp.2d 1255, 1268 (W.D. Okla. 2012) (the "mere dilution of stock does not constitute the type of irreparable injury that will support injunctive relief.")  Therefore, any past dilution of Plaintiff's equity interest in NetTalk does not constitute irreparable harm.

Second, where the challenged transaction will not impact the voting control, a claim that a minority shareholder will be diluted standing alone does not support injunctive relief.  *Louisiana Mun. Police Emp. Ret. Sys.,* 886 F. Supp.2d at 1268. *See also Klein v. Panic*, 1986 WL 438, *2 (Del. Ch., Nov. 20, 1986) (court found the dilutive effect a stock issuance does not establish irreparable harm where there was no claim that the additional stock would impact the voting control of the company).  As established above, because Plaintiff has never held a majority interest in NetTalk, it cannot succeed in arguing that its voting rights would be irreparably harmed by any potential dilution.

Third, Plaintiff also failed to establish irreparable harm with respect to the potential future dilution of Telestrata's ownership interest resulting from the increase in its authorized shares.  While courts in other jurisdictions hold a substantial dilution of a shareholder's ownership interest in, or right to control, a corporation, *may* constitute irreparable harm, the District Court appears to erroneously create a *per se* rule that dilution of a shareholder's ownership interest

and changes in control constitute irreparable harm.  (Doc 69 – Pgs 14-15.)  The caselaw cited by the District Court and Plaintiff does not support such a rule.

Whether the dilution of a shareholders ownership interest in, or loss of control of, a company constitutes irreparable harm is highly dependent on the circumstances of the case.  *See Louisiana Mun. Police Emp. Ret. S*ys., 886 F. Supp.2d at 1268*;Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd*., 339 F.3d 101, 114 (2d Cir. 2003).

The cases relied upon by the District Court (and Plaintiff) in support of its finding that the potential dilution of Telestrata's ownership position constituted irreparable harm are based upon factual scenarios different that the one presented here.  For example, in *Gitlitz v. Bellock*, a Colorado appellate court found that the loss of a *bargained-for contractual right* to manage or control a corporation, may constitute irreparable harm.  171 P.3d 1274, 1279-80 (Colo. App. 2007).  Similarly, in *Street v. Viti*, the court held that the plaintiffs established irreparable harm because, as a result of the dilution of their ownership interest to less than twenty percent, plaintiffs would suffer a loss of certain statutory rights, including the right to inspect corporate books and their rights under New York's dissolution statute. 685 F. Supp. 379, 384 (S.D.N.Y. 1988).

Here, in contrast to *Gitlitz* and *Vitti*, there is no allegation Telestrata will, as a result to a dilutive issuance, suffer any loss of statutory rights, or any bargained-for

contractual right to control NetTalk.  As set forth above, Plaintiff purchased a

minority interest in NetTalk.  The SPA does not provide Telestrata with any

protection against a dilution of its ownership interest.  Therefore, Telestrata's

position would not change as a result of any dilutive stock issuance. It was, and has

always been, a minority shareholder, and any issuance of additional NetTalk stock

will not change Telestrata's status.

Further, Telestrata has the same rights – no more, no less – as any other

minority shareholder.  Because Plaintiff cannot establish its right to control

NetTalk, or a right to a majority interest therein, it cannot establish that it would

suffer irreparable harm as a result of its ownership interest being diluted.

Accordingly, this Court should find that the District Court erred in

determining that the past alleged dilution, or potential future dilution of Plaintiff's

ownership interest in NetTalk constitutes irreparable harm.

### 3.    <u>Any Claimed Harm From Dilution is Speculative</u>

Additionally, the District Court overlooked the speculative nature of the

harm alleged by Plaintiff.  "Before the Court may issue a preliminary injunction,

the Plaintiff must show that irreparable harm is not merely possible, but likely."

*See United States v. Jenkins*, 714 F. Supp.2d 1213, 1222 (S.D. Ga. 2008) (citing

*Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 22 (2008)). The

amendment of NetTalk's Certificate of Incorporation to increase its authorized

shares from 300,000,000 to 1,000,000,000 will not, as the District Court

determined, result in the dilution of Plaintiff's ownership interest in NetTalk. (Doc

69 – Pg 16.)  The amendment merely increases the ***authorized*** shares of NetTalk –

not the ***issued*** shares.

Thus, any alleged harm by reason of a dilution of Telestrata's ownership

interest in NetTalk is speculative at this point, and cannot constitute irreparable

harm.

### 4.    Any Alleged Damage Can be Adequately Compensated by Money Damages

Finally, the District Court erred in finding that Plaintiff established

irreparable harm because, to the extent Plaintiff bases its request for preliminary

injunctive relief on its fraud claim, any harm allegedly suffered by Plaintiff can

adequately be compensated by money damages.  Only an injury that cannot be

remedied by money damages may be considered irreparable.  *Ferrero v.*

*Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991).

In its fraud claim, Plaintiff seeks money damages and rescission of the SPA,

demanding "damages, and a recession of the investment agreement, and a return of

its investment money".  (Doc 1 – Pg 26.)  Accordingly, by its own admission, any

damage allegedly suffered by Plaintiff as a result of the fraud claim can be

adequately compensated through money damages.  As a result, the Court's finding

that Plaintiff established irreparable harm was in error and should be reversed.

- 48 -

**C.** **The District Court Incorrectly Determined That a
Balancing of the Harms Favored Plaintiff**

The District Court also erroneously held that a balance of the hardships
favored Plaintiff. The District Court entirely discounted the substantial evidence
presented by Defendants at the Hearing regarding the potential harm NetTalk
would suffer as a result of the preliminary injunction as speculative and caused by
Defendants' own actions. (Doc 69 – Pg 17.) In making its determination, the
District Court yet again shifted the burden to Defendants to establish the extent of
harm they would suffer and found that Defendants failed to present non-
speculative evidence that the injunctive relief would impede NetTalk's day-to-day
operations. (*Id.* at 17-18.) This was improper.

The burden is on the movant on a motion for a preliminary injunction to
establish that the threatened harm outweighs the harm the preliminary injunction
may cause the non-moving party. *See Siegel*, 234 F.3d at 1176. "Indeed, the
Eleventh Circuit has cautioned courts to exercise great care before the entire case
has been fully and fairly heard to assure that the power of the court to require or
deter action does not result in unwarranted harm to the defendant or the public."
*GPS Industries, LLC v. Lewis*, 691 F.Supp.2d 1327, 1337 (M.D. Fla. 2010).

As set forth above, Plaintiff failed to establish that it will suffer irreparable
harm. It will merely be subject to the Individual Defendants using the shares that
were validly issued to them under the 2012 ESOP, and it will face *potential*

dilution of their ownership interest in NetTalk from additional issuances of stock. However, all of NetTalk's shareholders, including the Individual Defendants, will face dilution in any future issuance of stock.

On the other hand, although it did not have the burden of proof, NetTalk presented evidence at the Hearing that established it will suffer grave harm from the grant of a preliminary injunction – harm that far outweighed any injury alleged by Plaintiff. Defendants presented considerable evidence showing that NetTalk's chances of survival are bleak if the District Court were to grant the requested preliminary injunction. (Doc 65 – Pgs 6-7, 78.) Among other things, Defendants established that NetTalk was already in default under several notes, that enforcement under these notes was likely, that it would be unable to use its stock to attract investors to continue funding for its operation, and finally, that it would likely be forced into bankruptcy. (*Id.* at 6-7.)

The District Court's reversal of the burden of proof as to this element is made clear in the Order. (Doc 69 – Pgs 16-18.) The District Court held that, because Defendants had only presented evidence concerning harm to NetTalk, Plaintiff had "conclusively shown that the potential harm to the Individual Defendants does not outweigh the harm to Plaintiff." (*Id.* at 16.) The District Court was incorrect in making this determination.

For this reason, and the evidence presented by Defendants below, it is clear that the balance of the harms weighs in favor of Defendants.

### 1.    NetTalk Relies on Issuing Stock to Survive

NetTalk is considered a "mircocap" or "nanocap" company, an early-stage startup business that requires a constant flow of capital to survive its developmental years.  (Doc 64 – Pg 64.)  Like many microcap companies, NetTalk's only currency is its stock.  It relies on the ability to issue stock to investors in order to raise funds for operations, to compensate employees (including, in some instances, to pay back wages) and to pay certain vendors. (Doc 65 – Pgs 11-13, 78.)  NetTalk has effectively exhausted its authorized shares of stock and, without the ability to issue additional shares to fund its operations, it will likely be forced to close its doors. (*Id.* at 78.)

At the Hearing, NetTalk presented evidence that demonstrated that, as is common with microcap companies, NetTalk's only real chance at obtaining operational financing is by offering convertible debt through convertible promissory notes.  (Doc 64 – Pgs 67-68.)  However, NetTalk currently has no available stock in its treasury.  (*Id.* at 72-73; Doc – 65 Pg 17.)  Consequently, NetTalk established that a preliminary injunction would prevent it from increasing its authorized shares to continue raising the funds it relies on to operate.  (*Id.*)

### 2. The TRO and Preliminary Injunction Cause NetTalk to Default on Convertible Notes

Substantial harm warranting the denial of a preliminary injunction motion is found when a preliminary injunction would cause default on an existing loan. *See Goshen Road Environmental Action Team v. USDA*, 103 F.3d 117, 1996 WL 719963, *1 (4th Cir.1996) (unpublished table decision)

In opposition to the motion, and at the Hearing, NetTalk introduced evidence which showed that it entered into several secured convertible promissory notes pursuant to which investors provided NetTalk with a loan, in exchange for the ability to convert such debt into NetTalk, including the KBM Note and the JMJ Note. (Doc 62 – D Exh 30; Doc 64 – Pgs 67 – 69, 78.) Pursuant to the KBM Note, NetTalk is required to maintain a sufficient number of shares in reserve so there is a sufficient pool of stock available in the event that KBM elects to convert all or a portion of the promissory note. (Doc 62 – D Exh 30 – Pg 4.) The failure to set aside a sufficient number of shares constitutes an event of default under the KBM Note. (*Id.* at 5.) NetTalk presented evidence showing that, due to a severe drop in the price of NetTalk stock, it was required to reserve additional shares of its common stock. (Doc 65 – Pgs 81-83.) However, when NetTalk attempted to increase its authorized stock to, *inter alia*, comply with the KBM Note, Plaintiff prevented it from doing so by applying for an *ex parte* TRO. (Doc 33.) Thus, NetTalk demonstrated before the District Court that if the injunction was granted,

it would be in direct breach of its obligations under the KBM Note.[21]  Further,

NetTalk presented evidence to show that the holders of such notes would likely

seek enforcement of their rights thereunder.[22]  The District Court incredibly

discounted the foregoing evidence as "speculative".   (Doc 69 – Pgs 17-18.)

However, as anticipated by Defendants, on or about September 2, 2014,

KBM brought an action against NetTalk and certain Individual Defendants,

alleging, *inter alia*, that NetTalk was in default under the KBM Notes and seeking

to enforce its rights thereunder.[23]

---

[21] Contrary to the District Court's finding, the exhaustion of authorized shares of
NetTalk's common stock was not caused by Defendants' own conduct.  Plaintiff
failed to present any evidence that any shares of NetTalk stock were issued for any
improper purpose or as part of any alleged self-dealing by the Individual
Defendants.  To the contrary, the only competent evidence at the Hearing showed
that shares were issued to certain vendors of NetTalk for payment for services
rendered, and it certain of the Individual Defendants for partial payment of back
wages in lieu of cash.  (Doc 65 – Pgs 78-79.)  Thus, these issuances benefited
NetTalk.  Further, as a result of a severe reduction in the value of NetTalk's stock,
a significant number of shares of stock was required to satisfy these obligations.

[22] Healy testified that "[i]f there are no more shares available, then the convertible
debt holders are going to exercise their ability to default the note."  (Doc 65 – Pg
84.)  Defendants' witness Vikram Grover testified, based on personal knowledge
and familiarity with KBM, to the likely sequence of events following a default
under the KBM Note: "[t]he note increases by a balance of 50 percent. There are
also daily penalties. In some cases, KBM will not only sue the company, but go
after the executors personally if the shares are not available as they pledged." (Doc
64 – Pgs 80-81.)

[23] On October 5, 2015, Appellants moved to supplement the record on appeal to
include the complaint filed by KBM in the Eastern District of New York (Civil
Action No. 15-cv-5115) (the "KBM Complaint").  As of the filing of this brief,

Furthermore, the default under the KBM Note will automatically cause a default in other promissory notes and agreements – including the promissory note executed in favor of Plaintiff under the SPA.  (Doc 65 – Pg 6; Doc 62 – D Exh 15 – Pg 4.) Indeed, NetTalk's inability to cure the foregoing default will subject it to a devastating cascade of liability from creditors – including cross-default provisions triggering default under NetTalk's other convertible promissory notes and agreements.

### 3.    NetTalk will be Forced Out of Business and Into Bankruptcy

The evidence established that without the ability to issue stock to raise funds, or compensate employees with stock, NetTalk will likely be forced into bankruptcy.  (Doc 65 – Pg 22.)  Incredibly, Plaintiff conceded that a preliminary injunction could indeed force NetTalk into bankruptcy.  (*Id.* at 127, 142.)

Courts routinely decline to grant injunctive relief when a business is likely to be shut down or forced into bankruptcy as a result.  *See Miller's Ale House v. Boynton Carolina Ale House*, 2009 WL 6812111, *22 (S.D. Fla., Oct. 13, 2009) (finding that possible closure of defendants' business and bankruptcy outweighed plaintiff's harm of lost sales), *recommendation and report adopted by,* 2009 WL 6812112 (S.D. Fla., Nov. 30, 2009); *Outcomes Pharm. Health Care, L.C. v. Nat'l*

---

Appellants' Motion to Supplement the Record is still pending.  A copy of the KBM Complaint is attached to Appellants' Motion as Exhibit A.

*Cmty. Pharmacists Ass'n*, 2006 U.S. Dist. LEXIS 92927, *35 (S.D. Iowa Dec. 22, 2006) (finding that the balance of the harms weighs in favor of denying injunctive relief when defendants would be put out of business and millions of dollars of investment capital would be lost); *see Machlett Labs., Inc. v. Techny Indus., Inc.*, 665 F.2d 795, 798 (7th Cir.1981) (holding that competitive injury is outweighed by the harm of being put out of business).

As demonstrated above and at the Hearing, the preliminary injunction will likely result in NetTalk's demise. NetTalk will not be able to attract new investors or continue to compensate its employees. (Doc 65 – Pgs 5-7.) The evidence at the Hearing demonstrated that, as an early-stage tech company, NetTalk's survival depends heavily on its ability to attract valuable employees with a combined compensation plan of salary (cash) and stock (equity). (Doc 64 – Pgs 103-104.) Thus, the ability to issue stock is essential to NetTalk's daily operations and the District Court's Order has crippled its chances of survival.

Such existing and inevitable harm clearly tips the balance of harms in favor of Defendants. Accordingly, the District Court erred in reversing the burden and subsequently finding that the balance of the harms weighed in the Plaintiff's favor.

## II. THE DISTRICT COURT ERRED IN SETTING THE BOND AMOUNT AT $10,000

Finally, the District Court abused its discretion by failing to require Plaintiff to post a bond sufficient to satisfy the requirements of Fed. R. Civ. P. 65(c). In the

Order, the Court erroneously concluded that Defendants failed to present any evidence of the damages it would suffer of wrongfully enjoined.  (Doc 69 – Pg 19.)  The District Court therefore set the bond amount at $10,000 which it found sufficient to compensate Defendants for the post of preparing for and attending the three-day evidentiary hearing.  (*Id.* at 19.)  As set forth below, the District Court entirely ignored the evidence presented by Defendants of the harm NetTalk would suffer, and improperly set the bond for a nominal amount.

Rule 65(c) provides, in pertinent part, as follows:

> **Security.**  The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c).  Courts cannot waive the bond requirement of Rule 65(c), or set the bond at a nominal amount.  *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 297 F.R.D. 633, 636 (N.D. Ala.2014).  Rather, the District Court must fix the amount of the bond in an amount sufficient to pay the damages sustained by the enjoined party if it is found he was wrongfully enjoined.  *See Id*.

In determining the appropriate amount of the security, "district courts should err on the high side."  *Id*. (citing *Mead Johnson & Co. v. Abbott Lab*., 201 F.3d

883, 888 (7th Cir. 2000)). In *Black Water*, the Northern District of Alabama instructed:

> There is not a hint of suggestion in the language of Rule 65(c) that a bond can be set at an nominal amount or that the bond can be waived entirely in cases like this one where the damages that may be sustained would be enormous . . . It would more likely violate Rule 65(c) to eliminate the bond requirement entirely (or its equivalent, the setting of a nominal bond) than to require a bond in the millions . . .

297 F.R.D. at 636.

Here, the likely damage NetTalk would suffer if it is found that an injunction was wrongly granted, is the destruction of NetTalk. Accordingly, Defendants asserted that, if the District Court granting the injunction, the District Court should require a bond in the amount of the value of NetTalk. (Doc 67 – Pg 20.) At the Hearing, Defendants presented evidence that the enterprise value of NetTalk is approximately $5 million. (Doc 65 – Pg 85.)

Notwithstanding the foregoing, the District Court set the amount for security at the nominal amount of $10,000. (Doc 69 – Pg 19.) In setting the amount, the District Court improperly failed to take into account any potential damage NetTalk would suffer. Instead, it merely set the bond for the costs incurred by Defendants in opposing the motion for a preliminary injunction. (*Id.* at 19.) Setting the bond at such a nominal amount, and failing to even factor into the amount of security the

damages NetTalk would potentially suffer, as opposed to costs incurred in opposing the motion, was an abuse of discretion.

Accordingly, if this Court affirms that portion of the Order granting Plaintiff's motion for a preliminary injunction, it should reverse that portion of the Order setting the bond amount at $10,000, and set the bond at $5 million.

## CONCLUSION

For all the foregoing reasons, this Court should reverse the Order which granted Plaintiff's motion for a preliminary injunction in its entirety and vacate the preliminary injunction in its entirety.

Dated :  New York, New York
          October 6, 2015

SICHENZIA ROSS
FRIEDMAN FERENCE LLP
By: /s/ Christopher P. Milazzo
        Christopher P. Milazzo, Esq.
        (Pro Hac Vice)
61 Broadway, 32nd Floor
New York, New York 10006
(212) 930-9700 (tel.)
(212) 930-9725 (fax)
cmilazzo@srff.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

**I HEREBY CERTIFY** that this brief complies with the type-volume limitations set forth in FRAP 32(a)(7)(B).  This brief contains 13,883 words.

By: /s/ Christopher P. Milazzo
   Christopher P. Milazzo, Esq.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on October 6, 2015, that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day via transmission of Notice of Electronic Filing generated by CM/ECF on:

R. Livingston Keithley
Kelly & Walker LLC
1401 17th Street, Suite 925
Denver, CO 80202
lkeithley@kellywalkerlaw.com

Matthew Cragg Martin
Gaebe Mullen Antonelli Esco & Dimatteo
420 S. Dixie Highway, 3rd Floor
Coral Gables, FL 33146
mmartin@gaebemullen.com

Elaine Dawn Walter
Gaebe Mullen Antonelli & DiMatteo
420 S. Dixie Highway, 3rd Floor
Coral Gables, FL 33146
ewalter@gaebemullen.com

By: /s/ Christopher P. Milazzo
Christopher P. Milazzo, Esq.

- 60 -